# In the United States Court of Federal Claims

No. 10-048C

(Filed: November 30, 2011)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

RICHARD CARTER AND JERRY
GOODWIN, d/b/a R&J FEED,

                Plaintiffs,

v.

THE UNITED STATES,

                Defendant,

Contract; third-party beneficiary; *Astra*; mutuality; consideration

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Stephen Quesenberry*, Provo, Utah, with whom was *Michael Quesenberry*, for plaintiffs.

    *Michael Paul Goodman*, United States Department of Justice, Civil Division, Washington, D.C., with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Kirk Manhardt*, Assistant Director for defendant.

_____

OPINION

_____

BRUGGINK, *Judge*.

    This is an action for breach of an asserted contract between the United States Department of Agriculture, acting through the Commodity Credit Corporation ("CCC"), and beneficiaries of a drought relief program coordinated by the government and several states. Under the program, the federal government provided large quantities of nonfat dry milk to individual states, which distributed the nonfat dry milk to livestock producers. Before the

1

court is defendant's motion for summary judgment and plaintiff's[1] motion for Rule 56(d) discovery. The matter is fully briefed. Oral argument was held on September 6, 2011. For the reasons discussed below, we grant in part and deny in part defendant's motion for summary judgment and deny plaintiff's motion for additional discovery.

## BACKGROUND[2]

The early 2000s were a time of severe drought in western states, resulting in a significant shortage in livestock feed. To ameliorate the effects of the drought, the United States Department of Agriculture ("USDA") created a drought relief program in 2002 pursuant to 7 U.S.C. § 7285 (2006)[3]. The program allowed the USDA to contract with drought-afflicted states for the distribution of nonfat dry milk ("NDM") to foundation livestock producers and feed dealers. The program continued through 2004.

The NDM program was administered primarily by the CCC, a wholly-owned government corporation designed to aid and support agricultural producers. Each participating state executed a uniform document with the CCC, entitled "Nonfat Dry Milk Sales Agreement between the Commodity Credit Corporation and the State of _____."[4] Under the sales agreement, the CCC agreed to provide the state with NDM at a price of $1 per 21-ton truckload. It also provided a formula for determining the quantity of NDM which each state could request. The CCC also agreed to pay for transportation costs to deliver NDM to the states.

---

[1] Although two individuals appear as plaintiffs, because they are doing business as a single entity, we refer to them in the singular throughout.

[2] The material facts are not contested and are drawn from the plaintiff's second amended complaint and the undisputed proposed findings of fact.

[3] The statute provides that "The [CCC] may sell any commodity owned or controlled by the [CCC] at any price that the Secretary determines will maximize returns to the Corporation." 7 U.S.C. § 7285.

[4] This document is attached to several of the parties' filings before the court. *E.g.*, Def.'s Mot. Dismiss App. 1-2, July 26, 2010, ECF No. 18. We refer to the uniform document as the "NDM Agreement" throughout this opinion.

The standard agreement contained certain terms and conditions limiting the states' distribution to certain recipients and the recipients' use of the NDM. Each participating state agreed in section III of the agreement, "STATE COMMITMENTS," to:

> 1. Purchase NDM using documents provided by CCC . . . and to refrain from assigning or transferring any rights or obligations under this Agreement without written approval of CCC.
>
> 2. Establish and maintain distribution points capable of receiving, unloading from trucks, moving into storage, and distributing NDM to eligible producers.
>
> 3. Be responsible for all costs associated with the operation of the distribution points and all costs of delivery . . . .
>
> 4. Take action that the State determines to be appropriate to ensure that only producers of foundation herd livestock . . . receive NDM . . . .
>
> 5. Report to CCC the quantity of NDM purchased from CCC that exceeds the quantity authorized under this Agreement . . . .

NDM Agreement 2. The USDA retained the responsibility to enforce the limits on the use of NDM acquired by "third parties" other than states and eligible livestock producers.

Each participating state subsequently entered into form agreements, each entitled "Agreement to Participate in the 2003 NDM Livestock Feed Assistance Program," with feed dealers and livestock producers for the distribution and use of that state's share of the NDM. Plaintiff entered into such a standard agreement with several states. Plaintiff has offered the agreement between it and the state of Utah as representative of these agreements and transactions. That agreement contained the same restrictions enumerated above on the use of NDM. After signing the agreement, plaintiff then had to complete a voucher issued by the state authorizing receipt of a stated quantity of NDM and requesting a delivery date and location. Vouchers were issued by and returned to Utah and, like the sales agreement, contained

the same limitations on NDM use discussed above. Plaintiff submitted NDM order forms for the 2003 NDM program, and apparently received some NDM. In January 2004, however, CCC denied plaintiff's request for additional NDM.

R&J filed suit here in January of 2010, alleging that it had a contractual right to receive NDM and that the United States had breached that agreement. R&J subsequently amended its complaint, seeking $21 million in damages, and alleging five causes of action: (1) breach of implied-in-fact contract, (2) breach of third-party beneficiary contract, (3) breach of written contract, (4) breach of the covenant of good faith and fair dealing, and (5) equitable estoppel.

Defendant filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). We granted the motion to dismiss in part, eliminating all counts except the third-party beneficiary claim. *See* Order, Apr. 29, 2011, ECF No. 34. Defendant then filed the present motion for summary judgment under RCFC 56 directed at that remaining claim. It argues that there was no enforceable contract between the government and the states, and even if there was, plaintiff is nevertheless precluded from recovering as a third-party beneficiary. In response, plaintiff contends there was a valid and enforceable contract, but that it is unable to fully respond to the motion without additional discovery under RCFC 56(d).

**DISCUSSION**

We are presented with a contract interpretation issue. Interpreting a contract is a question of law amenable to summary judgment, assuming there are no relevant disputed facts. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). Defendant offers a number of theories to support its position that there was not an enforceable contract. Although we ultimately agree in part with some of those theories, we address first an argument with which we disagree.

I.  The subject matter of the agreement does not insulate it from treatment as a contract

Defendant argues that even if the NDM Agreement was otherwise binding, liability is nevertheless precluded because the government was acting in its sovereign capacity when it entered into the NDM Agreement.[5] The

---

[5] It is important to note that the government is not using a "sovereign acts" doctrine defense as contemplated by *United States v. Winstar Corp.*, 518

4

government relies primarily on *Kentucky v. United States*, 27 Fed. Cl. 173, 180 (1992), for the proposition that no express or implied contract can arise from acts performed by the government in its sovereign capacity. In this case, it contends, no contract was actually formed because the government was acting as sovereign, not as a contractor; the government's motivations were charitable and not commercial. In opposition, plaintiff argues that the NDM program was not a sovereign act and that additional discovery is required to show that the CCC's real purpose was to reduce costs to itself as well as to benefit drought states.

In *Kentucky*, the United States Army Corps of Engineers assumed control and operation over a series of locks and dams that the Commonwealth of Kentucky had built in the mid-1800s. *See* 27 Fed. Cl. at 174. In addition to rehabilitating the locks, the Corps built additional locks along the river. In 1979, as some of the locks approached nearly 140 years in age and experienced serious deterioration, the Corps decided that several of the locks no longer served their purpose. Accordingly, in an attempt to make more efficient use of funds and manpower, the Corps sought to close the deteriorating locks. After a public notice, the Corps formally decided to cease maintenance of certain locks and prepare for their divestiture. *Id.* Afterwards, Kentucky, acting through its Natural Resources and Environmental Protection Cabinet, expressed interest in continuing the operation of the locks and dams. After a series of meetings and negotiations between the Corps and the state, a memorandum of understanding ("MOU") was executed in 1985.

Pursuant to the MOU, the Corps would provide one-time maintenance and repairs to the covered locks. Kentucky was to make good-faith efforts to bring about legislation and appropriations to effectuate a fee-simple transfer of the locks to it. The state also agreed to maintain the locks during a transition period, which was defined as the time from execution of the MOU until the earlier of October 15, 1988, or when title was transferred. *Id.* at 175.

---

U.S. 839 (1996), which is implicated when a governmental action or legislation interferes with a pre-existing contract. *See* Def.'s Reply Sum. J. 11. Rather, as the government states: "Our defense is more fundamental than the sovereign act doctrine. We are asserting that there is no contract between the states and the Federal Government enforceable against the United States in the first place because the United States entered into those agreements in a sovereign, rather than contractual, capacity." *Id.*

Kentucky claimed that the Corps breached the MOU by not performing the one-time maintenance and repairs sufficiently to prevent a collapse of the locks. It also alleged that the Corps had not performed specific repairs identified by the state. *Id.* Kentucky therefore brought suit here for breach of contract.

The principal basis for the court's rejection of Kentucky's claim was that the MOU was not an express contract. The court continued its analysis, however, and discussed whether the government could be contractually liable for acts that are performed in its sovereign capacity. The court noted, "[e]ven if elements of a contract could be identified in the MOU, contract liability . . . 'does not extend to every agreement, understanding, or compact which can be stated in terms of offer or acceptance or meeting of the minds.'" *Id.* at 179 (quoting *Kania v. United States*, 650 F.2d 264, 268 (Ct. Cl. 1981)). More specifically, the court noted that "the Government is not liable for damages resulting from sovereign acts performed by it in its sovereign capacity." *Id.* Whether an act is sovereign or proprietary depends on "the nature of the Government's action and the nature of the parties involved." *Id.*

The court noted that the government was not entering into the marketplace to sell lands, goods, or services. *Id.* Additionally, the government did not derive a benefit in spending its resources on repairs, and all actions taken to repair the covered locks was in the public interest for the public benefit. *See id.* at 179-80. Therefore, the court held that "because no express or implied contract can arise from acts performed by the Government in its sovereign capacity, the MOU cannot establish the basis for Claims Court jurisdiction." *Id.* at 180 (internal citations omitted).

In reliance on the decision in *Kentucky*, defendant here argues that the NDM program was strictly an act of benevolence, not a commercial arrangement or sale. It contends that the government was divesting itself of NDM to benefit the states and for the public good. Defendant characterizes the NDM program as a "gift from the Government, through the states, to the program's beneficiaries . . . in pursuance of federal policies." Def.'s Mot. Summ. J. 11 (internal citations omitted). Additionally, according to defendant, the NDM program was done for the common good and general welfare. Plaintiff, on the other hand, argues that the NDM program was not a benevolent act but was rather intended to stop the financial hemorrhaging resulting from the costs of managing and warehousing NDM.

We reject defendant's argument. *Kania v. United States*, on which *Kentucky* depends, involved an alleged agreement not to prosecute plaintiff in exchange for his cooperation in a criminal investigation. 650 F.2d at 265-67. The Court of Claims, obviously uncomfortable treating a relationship created during a criminal investigation as a contract, viewed such an arrangement as beyond its jurisdiction, analogizing it to the relationships between civilian employees and military personnel to the government. *See id*. at 268-69. *Kania* largely has been limited to the context of criminal proceedings. *See Sadeghi v. United States*, 46 Fed. Cl. 660, 662 (2000) ("[T]his court has consistently found that it lacks jurisdiction over suits asserting the breach of plea bargains, immunity agreements, and witness protection agreements."); *Drakes v. United States*, 28 Fed. Cl. 190, 193 (1993) ("Administering the criminal justice system is an activity that lies at the heart of sovereign action. As such, breach of a contract arising out of that system does not give rise to an action under the Tucker Act for money damages."); *see also Sanders v. United States*, 252 F.3d 1329 (Fed. Cir. 2001); *Woodson v. United States*, 89 Fed. Cl. 640 (2009); *United States v. Zajanckauskas*, 346 F. Supp. 2d 251 (D. Mass. 2003); *Doe v. United States*, 37 Fed. Cl. 74 (1996); *Grundy v. United States*, 2 Cl. Ct. 596 (1983).

The court in *Kania* distinguishes *Texas v. United States*, 537 F.2d 466 (Ct. Cl. 1976), which we view as much closer to the present facts. In *Texas*, the court held that an assistance agreement was a contract and thus enforceable by the state: "defendant's valid execution of a document, which it prepared and titled 'Federal-State Disaster Assistance Agreement,' specifying that 'Federal assistance will be made available in accordance with (various specified laws, Executive Orders and regulations)' obligates defendant to provide such assistance as called for by the parties' Agreement." *Id.* at 468; *see also Arizona v. United States*, 494 F.2d 1285 (Ct. Cl. 1974). The teaching of these cases is that the government can contractually bind itself even when it is undertaking charitable or assistance actions. *See Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) ("[I]n cases involving grants and cooperative agreements, this court has . . . [often held] that jurisdiction exists to consider whether such agreements were breached."). The possibility that the government was promoting some larger policy aim by making NDM available for purchase does not mean that a contract did not come into existence. The contract does not become unenforceable merely because the government remains sovereign throughout. Nor is the act of selling commodities at a substantial discount so uniquely a sovereign function that any promises made in the process are unenforceable. We conclude that the subject matter of the

exchange is not inherently inappropriate for treatment as a contract. Therefore, we reject this defense, and discovery to counter it is unnecessary.

II.   The agreement between the states and USDA was not a binding and enforceable contract

   A.   The agreement lacked mutuality of obligation and consideration

The defendant argues that the agreements between the states and the USDA are unenforceable for two reasons: (1) they lacked any obligation by the respective states, and (2) there was no consideration given to the government. Accordingly, the agreements do not constititute binding contracts, and therefore cannot create third-party benefits. Plaintiff counters by arguing that the contract was supported by consideration because the states agreed, *inter alia*, to pay $1.00 per truckload, assume the risk of loss of the NDM, use specified order forms, establish distribution points, and bear the costs of delivery. Moreover, plaintiff believes it can demonstrate that the government received additional consideration in the form of cost savings by no longer having to store the NDM.

A contract requires "a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) Contracts § 17 (1981); *see Franklin Fed. Sav. Bank v. United States*, 431 F.3d 1360, 1367 (Fed. Cir. 2005). Consideration is generally a bargained for exchange consisting of an act, forbearance, or return promise. *See* Restatement (Second) Contracts §§ 71, 72 (1981); *see also J. Cooper & Assocs., Inc. v. United States*, 53 Fed. Cl. 8, 18 (2002). Moreover, government officials "lack authority to enter into contracts under which the government receives nothing." *Aviation Contractor Emps., Inc. v. United States*, 945 F.2d 1568, 1573 (1991). Thus, for the contract to be binding, consideration must flow simultaneously to the government. It is therefore necessary to determine what, if any, consideration flowed to the government at the time the agreement was struck.

Plaintiff points to section III of the agreement, "STATE COMMITMENTS," to demonstrate the consideration the government received in terms of promises by the state as to how it would enforce the program. In addition, plaintiff argues that cost savings which would inure to the government by virtue of disposing of the NDM are also sufficient

consideration to support the agreement.[6]  Finally, it is undisputed that the government made certain commitments under the agreement to sell NDM at $1.00 per truck to the states.

The Supreme Court has held that a contract lacks consideration and mutuality, and is therefore unenforceable, when it does not require the government to take or limit its demand to an ascertainable quantity. *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 493 (1923). In *Modern Systems Technology Corp. v. United States*, 979 F.2d 200 (Fed. Cir. 1992), for example, the Federal Circuit construed a basic pricing agreement involving the United States Postal Service as unenforceable.  In that case, even though the pricing agreement contained standard contract provisions, it was unenforceable until orders were placed.  The court found that under the agreement, "the Postal Service is not obligated to place any orders, and that the contractor is not bound unless it accepts an order." *Id.*

The agreement here is similarly deficient in mutual exchanges of binding promises.  There is nothing in the NDM Agreement which affirmatively obligates a state to purchase any NDM.  Like the agreement in *Modern Systems*, the NDM Agreement simply provided those contract terms that would apply once a state placed an order for NDM.  None of the asserted consideration flowed to the government unless a state actually placed an order.

The NDM Agreement was, in effect, an offer by the USDA to sell under certain terms.  The offer was not accepted, however, by a state's bare agreement to adhere to certain terms.  That agreement was conditioned on placement of an order.  The commitments to which plaintiff points might be sufficient consideration *if and only if* a state actually ordered NDM.  There was not a specified minimum quantity, thus until a state submitted an order to the CCC, it was not bound in any way.

The Restatement (Second) of Contracts describes an illusory promise as one "which by [its] terms make performance entirely optional." Restatement (Second) Contracts §77 (1981); *see also Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1062 (Fed. Cir. 2002) ("[A] valid contract cannot

---

[6] The plaintiff submitted an e-mail between government officials noting that selling NDM even at a substantial discount would result in overall cost savings to the government.  *See* Quesenberry Decl. Ex. E at 2, Jan. 7, 2011, ECF No. 29-1.

be based upon the illusory promise of one party."). Illustration 1 of the Restatement provides an example:

> A offers to deliver to B at $2 a bushel as many bushels of wheat, not exceeding 5,000, as B may chose to order within the next 30 days. B accepts, agreeing to buy at that price as much as he shall order from A within that time. B's acceptance involves no promise by him, and is not consideration.

Restatement (Second) Contracts § 77 illus. 1 (1981); *see Torncello v. United States*, 681 F.2d 756, 769 (Ct. Cl. 1982) (citing Illustration 1 of Restatement (Second) Contracts § 77(1981)).

The NDM Agreement parallels Illustration 1. A state could purchase all the NDM it wanted, or none at all. This left the state's "future action subject to [its] own will, just as it would have been had [it] said no words at all." *Ridge Runner*, 287 F.3d at 1062. Because the states were not bound to any particular course of action at execution, the NDM Agreement, in the absence of an order for NDM, did not constitute a binding and enforceable contract.

Even though the agreement is denominated a "Sales Agreement," and includes terms such as "sales," "purchase," "shall," and other contract language, a "court is not bound by what the contract is called, it must look to the terms in deciding what it is." *Ralph Constr., Inc. v. United States*, 4 Cl. Ct. 727, 731 (1984). Because the NDM lacked mutuality of obligation and consideration, those terms do not transform an otherwise non-binding arrangement into a contract.

  B. The NDM Agreement is neither a requirements nor indefinite quantity contract

To escape the conclusion that the agreement is not supported by consideration and mutual obligation, plaintiff argues that the agreement was either a requirements contract or an indefinite quantity contract. If the NDM Agreement is either of these, it would be supported by consideration and mutual obligation. Plaintiff's RCFC 56(d) motion for discovery seeks discovery to support this argument.

As the Federal Circuit has noted, supply contract terms generally "fit into one of three possible types of contracts: those for a definite quantity, those

for an indefinite quantity and those for requirements." *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1331 (Fed. Cir. 2000) (quoting *Torncello*, 681 F.2d at 761-22). A requirements contract is formed when "the seller has the exclusive right and legal obligation to fill all of the buyer's needs for the goods or services described in the contract." *Modern Systems*, 979 F.2d at 205. The *sine qua non* of a requirements contract is "the promise by the buyer to purchase the subject matter of the contract exclusively from the seller." *Id.* Regarding consideration, "[i]t is now beyond question that contracts for requirements do not lack mutuality and are enforceable." *Locke v. United States*, 283 F.2d 521, 523 (Ct. Cl. 1960).

An indefinite quantity contract is another form of variable quantity contract in which the government obligates itself to buy, or, in this case, sell, at least a stated minimum quantity. *See Varilease*, 289 F.3d at 799; *see also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 1238 (3d ed.1998). An indefinite quantity contract differs from a requirements contract in that it does not obligate the buyer to purchase more than the stated minimum. *See Varilease*, 289 F.3d at 799. Just like requirements contracts, indefinite quantity contracts are not unenforceable for want of mutuality of obligation or consideration. One contracting party is making a promise to purchase the minimum quantity. Therefore, if the NDM Agreement is either a requirements contract or an indefinite quantity contract, it would be enforceable.

Plaintiff can point to nothing in the NDM Agreement which supports either a requirements or indefinite quantity contract, i.e., an exclusivity promise or a minimum quantity promise. Plaintiff suggests, however, that if it were allowed to conduct discovery, it might be able to offer evidence as to the following: (1) that the drought states did not receive NDM from any other sellers, (2) that the CCC intended to fill all received NDM orders until it invoked the termination clause in the agreement, and (3) that the drought states' conduct, course of dealings, trade norms, and customs demonstrate an intent to be bound by the NDM Agreement. Plaintiff offers nothing to support these speculations, but more importantly, even if these assertions were true, they would not cure the problem because they cannot supply the necessary missing terms.

First, plaintiff asserts that given additional discovery, it could show that the states obtained NDM only from the CCC. It would take more than that, however, to create a legally enforceable right within the federal government to force the states to purchase all NDM they "required." A commitment to

11

buy is not a term which merely gives clarity or definition to an established contractual relationship. The missing term marks the difference between an ongoing series of offers and acceptances relating in this case to a virtually free commodity and a contractually binding relationship. We must consider the uniqueness of this program: the fact of receipt of multiple truckloads of NDM at $1 per ton, a price tantamount to giving the NDM away, would never be sufficient proof that the states were committing to continue purchasing the product.

Second, plaintiff seeks discovery into the intent behind and the parties' understanding of the thirty-day supply and termination provisions. The thirty-day supply provision provided that, "A 30 day supply of NDM for the State will be calculated at the rate of two pounds of NDM per eligible cow and bison per day, and one half pound NDM per sheep and goat per day." NDM Agreement 1. The termination provision provided that, "This Agreement shall remain in force and effect until terminated by CCC or the State upon written notice." NDM Agreement 2. Plaintiff hopes additional discovery into these provisions will shed light on whether "CCC intended to fill all NDM order submitted by the designated drought states until invoking the termination provision, or whether the CCC intended to unilaterally reject orders . . . prior to invoking the termination provision." Pls' Mem. Opp. Summ. J. 13. We fail to see how any possible outcome bears on whether the NDM Agreement is a requirements or minimum quantity contract. Whether CCC intended to honor orders submitted to it, or the manner in which CCC could terminate the agreement, relate to the issues of performance and breach of an already enforceable contract; they do not create an enforceable contract where one did not otherwise exist.

Third, plaintiff wants an opportunity "to discover the designated drought states' conduct to establish their belief in entering into an enforceable contract." Pls' Mem. Opp. Summ. J. 13. Plaintiff is hoping to establish that the states, by their conduct, demonstrated their belief that they had entered into enforceable contracts with some minimum guaranteed amount. Not a shred of support is offered to suggest that such evidence exists or that plaintiff itself operated on that assumption. In the face of apparent plain meaning of an integrated document, and the burden plaintiff would face in using it to

contradict that plain meaning,[7] we decline to authorize what would amount to a fishing expedition.

We are, therefore, presented only with the document itself to determine whether it is a requirements or indefinite quantity contract. We conclude that it is neither. The NDM Agreement cannot be read as a requirements or minimum guaranteed quantify contract. This does not preclude, however, the NDM Agreement from becoming enforceable by the parties' subsequent conduct. Thus, while we agree with the defendant that the NDM Agreement was not enforceable at its execution, as we explain below, we nevertheless hold that a binding contract was formed when the states submitted an order under the NDM Agreement.

III.  To the extent that an order was placed, a contract was formed to which plaintiff is a third-party beneficiary

While the NDM Agreement at its inception was not enforceable, this does not mean that it could not become enforceable by the subsequent actions of the parties, i.e., a state accepting the terms of the agreement by submitting an order. In *Willard*, the Supreme Court held that although an agreement was not enforceable at execution because it lacked mutuality of obligation, "it became valid and binding to the extent that it was performed." *Willard, Sutherland & Co. v. United States*, 262 U.S. 489, 494 (1923). As in *Willard*, to the extent that an order was placed and performed, the NDM Agreement became binding. By submitting an order to the USDA, a state accepted and

---

[7]Although not always with consistency, the Federal Circuit is one of the less receptive circuits with respect to the use of extrinsic evidence to elucidate an otherwise plain contract. *See Coast Fed. Sav. Bank v. United States*, 323 F.3d 1035, 1038 (2003) (holding that contract terms were "clear and unambiguous" and as such had to be given their plain and ordinary meaning, "and we may not resort to extrinsic evidence to interpret them"); *see also Connor's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1306 (Fed. Cir. 1998) ("[A] contract lacking [a minimum quantity term] cannot be construed as a valid indefinite quantity contract."). *Crown Laundry & Dry Cleaners v. United States*, 29 Fed. Cl. 506 (1993), cited by plaintiff, is inapplicable. Although the court allowed extrinsic testimony to determine whether the parties intended a requirements contract, the court found the contract was ambiguous and could be interpreted as either a requirements or indefinite quantity contract. *See Crown Laundry*, 29 Fed. Cl. at 518 n.5. Such ambiguity does not exist here.

bound itself to the terms of the NDM Agreement. At that point in time, therefore, all the elements of a binding contract were present: offer, acceptance, and consideration. Upon submitting an order form under the program, a state agreed to be bound by the terms of the NDM Agreement with respect to the ordered NDM, thus curing the deficiency present at the agreement's execution. At oral argument, plaintiff's counsel represented that there were such orders initiated by plaintiff which had not been filled. That issue, however, has not been the focus of discovery or briefing.

Assuming plaintiff could demonstrate that orders were placed under the program and those orders were not filled, the issue of whether plaintiff is a third-party beneficiary still needs to be resolved. Defendant points out that it is not enough that plaintiff would have ultimately benefited from the agreement–i.e., because it was merely an incidental beneficiary–rather, the federal and state governments must have intended the third-party to receive the promised performance. *See* Restatement (Second) Contracts § 302 (1981).

The appropriate test for an intended third-party beneficiary is that the contract must "reflect[] the intent of the parties to the contract to benefit the third party." *Dewakuku v. Martinez*, 271 F.3d 1031, 1041 (Fed. Cir. 2001). The benefit to the third party must be direct, see *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912), but that intent may be express or implied. *See Caguas Cent. Fed. Sav. Bank v. United States*, 215 F.3d 1304, 1309 (Fed. Cir. 2000). Indeed, the third party need not even be specifically identified in the contract as long as it "fall[s] within a class clearly intended to be benefited thereby." *See Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997).

The stated purpose of the NDM Agreement was to provide NDM "for distribution to livestock producers suffering from drought conditions." NDM Agreement 1. To accomplish this goal, the terms of the NDM Agreement had very specific guidelines regarding those producers and third-parties who could receive NDM.[8] There is no doubt that the beneficiaries of the NDM

---

[8] The NDM Agreement provided the following limits to all users of the NDM program:

> (1) the NDM may not be used as a replacement for whey or whey products; (2) the NDM may not be processed for or used for human consumption; (3) ultimate consumption of the NDM so acquired must be "in-state," that is, in the state allocated the NDM; (4) such NDM may, however, be processed outside that

Agreements were to be the livestock producers. The states were mere conduits to funnel the NDM to the producers, who would actually use and benefit from the NDM. Plaintiff asserts that it was a livestock producer and hence presumptively within the class of intended third-party beneficiaries. It would appear, then, that the contract "reflect[ed] the intent of the parties to the contract to benefit the third party," *Dewakuku*, 271 F.3d at 1041, which in this case was livestock producers.

Defendant contends, however, that there is an additional requirement present when one of the parties to the contract is the United States. It argues that the putative third-party beneficiary must also demonstrate that the contract expressly indicates that the third-party has enforcement rights under the contract. A previous decision of this court indeed held that a contract must give the third-party the direct right to compensation or the ability to enforce that right against the promisor. *See Baudier Marine Elecs. v. United States*, 6 Cl. Ct. 246, 249 (1984). That holding in *Baudier*, however, was explicitly rejected by the Federal Circuit in *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997); *see also Schuerman v. United States*, 30 Fed. Cl. 420 (1994).

In *Montana*, the Federal Circuit intimated, however, the possibility that a greater showing could be warranted when "members of the public bring suit against promisors who contract with the government to render a public service." 124 F. 3d at 1273 n.6. The scenario envisioned, though, is one in which the contract is to provide a public service of general application, such as water or fire protection, e.g., *H. R. Moch Co. v. Rensselaer Water Co.*, 159 N.E. 896 (N.Y. 1928), where there clearly can be no presumed intent to create enforcement rights in individual members of the public.

---

> state if returned by or from the processor directly to the originating state (the state that was allocated the NDM under this agreement) and consumed in the originating state; (5) consumption of the NDM by livestock normally housed in-state will be considered to be consumption "in-state" even thought the herd is quartered temporarily elsewhere; (6) the third party must acknowledge and agree to these limitations; (7) the third party shall, upon inquiry, certify the disposition of the NDM for the proper use and certify to compliance with all other limitations of this agreement on the use of the NDM and the products made from it.

NDM Agreement 1.

The government nevertheless believes that the possibility intimated in *Montana* has now been recognized by the Supreme Court in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. __, 131 S.Ct. 1342 (2011), in such a way that all putative third-party beneficiaries must point to specific contract language giving them enforcement rights,[9] thus, in effect, resurrecting the test set forth in *Baudier*. We disagree.

*Astra* involved section 340B of the Public Health Services Act, 42 U.S.C. § 256b (West Supp. 2011). Section 340B imposes ceilings on the prices drug manufacturers charge for medicine sold to certain health care facilities. *Astra*, 131 S. Ct. at 1345. Drug manufacturers opt into the 340B program by signing a uniform agreement called the Pharmaceutical Pricing Agreement ("PPA"). The PPAs are uniform agreements which recite the provisions of section 340B. *Id.* In *Astra*, the health care providers conceded that Congress did not intend to create a private right of action under section 340B for those entities who charge prices exceeding the statutory ceiling. *Id.* The issue was whether they could sue as third-party beneficiaries under the PPAs. *Id.* The Supreme Court held that they could not: "PPAs simply incorporate statutory obligations and record the manufacturers agreement to abide by them." *Id.* at 1348. Therefore, "[t]he absence of a private right to enforce the [statute] . . . would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling price obligations instead." *Id.* According to the Court, "[t]he statutory and contractual obligations, in short, are one and the same." *Id.* Because private suits to enforce section 340B and third-party suits to enforce the contract

---

[9] To support this proposition, the government cites to *Alpino v. JPMorgan Chase Bank, Nat. Ass'n*, 2011 WL 1564114 (D. Mass. 2011). The government asserts that the *Alpino* court endorsed its reading of *Astra*. In *Alpino*, the issue was whether homeowners were third-party beneficiaries of an agreement between the federal government and mortgage servicers under the Home Affordable Modification Program. Under the program and pursuant to the agreements, mortgage servicers were to consider loans for modification. The *Alpino* court held that homeowners were not third-party beneficiaries. The specific agreement in that case limited the class of persons who could enforce the agreement (a fact not present here). *Id.* at *4. The court also cited prior pre-*Astra* decisions construing the same agreement to preclude third-party enforcement. *Id.*; *see also Speleos v. BAC Home Loans Servicing*, 10-11503, 2010 WL 5174510 (D. Mass. Dec. 14, 2010) (declining third-party beneficiary status to homeowners under the same agreement).

implementing section 340B were effectively the same in substance, "[t]heir treatment, therefore, must also be the same." *Id.* at 1345.

The Court noted that the statute itself contains a mechanism by which the federal government could bring enforcement actions against drug companies and recover penalties payable to the health care providers. *Id.* at 1350. A money remedy, in other words, already existed under the statute. Plaintiffs were in effect circumventing Congress's intent not to provide a private cause of action by bringing a breach of contract claim.

Defendant directs us to the portion of *Astra* in which the Court quotes *Corbin on Contracts*, "'The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity.'" 131 S. Ct. 1348 (quoting 9 J. Murray, *Corbin on Contracts* § 45.6, p. 2 (rev. ed. 2007)). We view this observation to be consistent with the concerns expressed in *Montana* and *Moch*. As the Restatement expresses it: "Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." Restatement (Second) Contracts § 313, cmt. a (1981).

The NDM program here was very different from the statutory scheme in *Astra* or the public service circumstances contemplated in *Moch*. There was no enforcement mechanism in the NDM program with which a private remedy could overlap or compete. The NDM Agreement was not based on any comprehensive statutory scheme like that in *Astra* in which particular contract provisions were dictated by the statute. The statute here merely allowed the CCC to sell any commodity it owned. *See* 7 U.S.C. § 7285 (2006). The concerns presented in *Astra* thus are not present. The NDM Agreement has much more of the appearance of a commercial arrangement than a contract facilitating the government's provision of utilities or other general services. The general test set forth in *Montana* remains the appropriate one.

Accordingly, we hold that livestock producers who qualified under the agreements and submitted NDM orders are third-party beneficiaries. Plaintiff asserts that it was a livestock producer. We note, however, that we make no judgment as to whether such a contract was breached. We decide today only that plaintiff may pursue a breach action as a third-party beneficiary, assuming it qualifies under the NDM Agreement as a livestock producer, with respect to specific orders by a state for NDM.

17

## CONCLUSION

For the reasons stated above, we grant defendant's motion for summary judgment in part with respect to NDM that was never ordered. We deny summary judgment with respect to any NDM to which an order form was submitted to the USDA from a state on behalf of plaintiff.

<u>s/ Eric G. Bruggink</u><br>
Eric G. Bruggink<br>
Judge